**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY PRO SE OFFICE

2017 MAY -3  PM 3: 00

S.D. OF N.Y.

STEVEN WILLIAMS
Plaintiff,

V.
THE CITY OF NEW YORK
NYPD
DEPUTY INSPECTOR JOHN
CAPPELMAN
Police Officer Zulema Porter, Shield No. 15797
Police Officer Kevin Dwyer, Shield No. 00538
DR. ANTHONY LUJACK
DR.MALAGA ARAGON
DR. DAVID KLAHR,
DR. AARON PATTERSON,
DR. GOLDBERG
DR. ROCCISANO
BIMS JOHN DOE 1
BIMS JOHN DOE 2
BIMS JOHN DOE 3
Defendants

16-CV-4315-JGK

PLAINTIFF DEMANDS
JURY TRIAL



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5 3 2017



A MENDED
**COMPLAINT**

Plaintiff STEVEN A. WILLIAMS *pro se*, alleges and avers follows:

**NATURE OF THE CASE**

1. This is a civil rights actions stemming from the involuntary commitment of the

   Plaintiff on December 2, 2013.

**JURISDICTION**

1. This Court has subject matter jurisdiction pursuant the 28 U.S.C. §1331, which

   gives district courts original jurisdiction over civil actions arising under the

   Constitution, laws, and treaties of the United States, and 28 U.S.C §1367, which

   give the district court supplemental jurisdiction over state law claims.

## VENUE

2.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391 in that the City of New York is a municipal corporation that resides in the Southern District of New York.  Further, a substantial part of the events or omissions giving rise to these claims occurred in the City and County of New York.

## JURY DEMAND

3.  Plaintiff demands trial by jury for each and every one of his claims as pleaded herein.

## PARTIES

4.  Plaintiff STEVEN A. WILLIAMS is and at all times relevant to this action a resident of the County and City of New York.

5.  Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in area of law enforcement and for which it is ultimately responsible.  Defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and employment of police officers.  Defendant CITY OF NEW YORK was at all times relevant herein the public employer of Defendants NYPD Officers.

6.  Defendant MOUNT SINAI BETH ISRAEL ("MSBI") is nonprofit teaching hospital located at First Avenue at 16th St. in New York, NY 10003, and performs all functions of a hospital.

7.  DR. ANTHONY LUJACK, DR.MALAGA ARAGON, DR. DAVID KLAHR, DR. AARON PATTERSON, DR. GOLDBERG, DR. ROCCISANO, BIMS JOHN DOE 1, BIMS JOHN DOE 2, and BIMS JOHN DOE 3 are employees of Mount Sinai Beth Israel and Mount Sinai Health Systems.

8.  MSBI is one of seven members of MOUNT SINAI HEALTH SYSTEM, a nonprofit hospital system, located at 150 East 42nd Street, Second Floor, New York, NY 10017.

## FACTUAL ALLEGATIONS
### BACKGROUND

9.  The Plaintiff was 43 years old when the acts and omissions complained herein occurred.  The Plaintiff has no history of mental illness.

10. The Plaintiff worked on Wall St. for 15-years as a derivatives trader, portfolio manager, and strategist.  The Plaintiff is an outspoken advocate of financial market reform and vocal critic of regulatory capture.  His views and opinions have been reported by financial news publications including Barron's, Bloomberg, the Financial Times, and the Wall St. Journal.

11. The Plaintiff published a report that implicated Investment Banks of colluding with High-Frequency-Trading ("HFT") firms of colluding to manipulate their own products in April 2012.  The report was sent to financial market regulatory

authorities, members of the US Congress, and featured in Barron's and the Wall St. Journal.

12. The Plaintiff's report prompted the Securities and Exchange Commission ("SEC") into opening an investigation into his allegations.  Subsequently, the Plaintiff's (former) employer mounted a shocking and outrageous retaliation campaign to defame him as mentally ill and undermine his credibility as a whistleblower.

13. The firm subjected the Plaintiff to a type of psychological known as "Gaslighting".   An elemental definition of Gaslighting is "to manipulate (a mentally healthy person) by psychological means into believing he's mentally ill".

14. Gaslighting is a clinical term for a type of psychological abuse that's characteristic of aggressive *subtypes* (psychopathic, sociopathic, and malignant narcissistic) of antisocial personality disorder.  A "normal" person isn't capable of Gaslighting somebody.  Gaslighting involves the "disordered" traits in cognition, emotion, and behaviors that are markedly abnormal in the above subclinical subtype personality disorders.

15. The CEO of the Plaintiff's former firm has a personality disorder.  The firm contracted the CEO's psychiatrist for political abuse of psychiatry, or the misuse of psychiatric treatment and diagnosis, as part of part of its repugnant campaign. The firm forced a constructive discharge in September 2012.  The CEO of the Plaintiff's former employer, not his psychiatrist, tried for several weeks to

manipulate the Plaintiff into believing he's mentally ill, and to take psychotropic medication.  The Psychiatrist wrote a prescription in October 2012.

16. In January 2013, the Plaintiff read for the first time about Gaslighting.  He sent an email and confronted senior management.  Not long after, the firm accused him of harassment and contacted the District Attorney of New York ("DANY") for an order of protection.

17. On the morning of February 7, 2013, the Plaintiff received an email from an attorney with a cease-and-desist order attached.  About thirty minutes later, the Plaintiff received a call from NYPD Detective Mistritta.  The two talked for several minutes, and again in person that afternoon.

18. The Plaintiff's former employer, among other things, had mismarked and withheld his FINRA Form U-5 (securities license).  The Plaintiff had sent dozens of emails to senior management insisting upon an exit interview for, among other things, clarity on how Form U-5 had been marked.  The firm submitted these emails as proffering support for their claims of harassment.

19. The Plaintiff explained to Detective Mistritta that he was being retaliated against and defamed.  He admitted to sending dozens of emails, but explained that he'd been diligent about not writing anything that could be twisted to look like a threat. Detective Mistritta had read the emails before they met.  He explained to the Plaintiff that he was sympathetic to his situation, but that he had to stop emailing his former employer.  The Plaintiff told Detective Mistritta that he needed clarity on his Form U-5, and access to witnesses.  Detective Mistritta explained that he

couldn't help with a civil suit, and suggested the Plaintiff ask the attorney the firm

hired to file the complaint if he could arrange an exit interview.

20. Detective Mistritta explained that the attorney the firm hired to file the complaint

worked for many years as an Assistant-District-Attorney ("ADA").  Detective

Mistritta, who was stationed out of DANY, told the Plaintiff that the former ADA

was a "good guy".  The Plaintiff thanked Detective Mistritta for his handling of

the complaint and gave him his word that he'd stop emailing his former firm.

21. The Plaintiff, of course, never got that exit interview.  His knowledge of

personality disorders at the time was limited to the fact that they exist.  He sat

paralyzed in horrific awe over the next several months as his former employer

unleashed a smear campaign that wreaked havoc across every aspect of his life.

22. The Plaintiff sought desperately for a solution.  In November 2012, he read that

it's a criminal offense to use individually identifiable health information for

personal gain and/or malicious harm 42 USC § 1320d-5.  He'd learned enough

about the CEO's condition to realize that what he thought was a "perfect plan"

was just the out of control pathology of malignant narcissism.

23. The Plaintiff wasn't under any illusion that his allegations would be well

received.  He'd tried and failed to explain the CEO's condition to multiple

people, but didn't think that he'd have a problem with law enforcement

considering the potency of criminality associated with this condition.

24. The Plaintiff called DANY and asked to speak with an ADA.  The Plaintiff was

asked the purpose for his call.  He explained that he wanted to discuss potential

criminal activity stemming from a retaliation campaign against him, and

explained that the CEO of his former employer has a personality disorder and paid his psychiatrist to assist with defaming him as mentally ill. The Plaintiff was told after a long pause that DANY couldn't help him. The Plaintiff replied that he understood how strange his allegations may seem, but that he could prove that it's true and somebody who's familiar with aggressive personality disorders won't find it at all difficult to believe. The Plaintiff was told again that DANY couldn't help him.

25. The Plaintiff tried several more times to arrange a meeting with an ADA over the next several weeks. He was told each time that DANY couldn't help him. Frustrated, the Plaintiff explained that he has no idea how one goes about reporting a crime such as this, and asked DANY what he should do. The Plaintiff was told to try his NYPD precinct.

## NYPD's NINTH PRECINCT

26. At around 10:45 am on December 2, 2012, the Plaintiff walked into the NYPD's ninth precinct and asked if he could speak with a detective.

27. The NYPD employee at the front desk informed him that the detectives were busy, and asked if she could help him. The Plaintiff said that it wasn't pressing, explained that he wanted to discuss potential criminal conduct on the part of his former employer, and asked if he could schedule an appointment. The NYPD employee said that sounded like something he should discuss with DANY.

28. The Plaintiff explained that he'd tried several times to meet with an ADA before being told that he should try the NYPD. The NYPD employee asked him to explain. The Plaintiff explained that he's a whistleblower, and that his former

employer paid a psychiatrist to defame him as mentally ill and undermine his

credibility. The NYPD asked, "What sort of whistleblower?" The Plaintiff told

her that he used to work on Wall St., and that explained that he'd exposed a

substantial financial fraud involving his former employer's most important client.

29. The NYPD employee asked, "How much money was stolen?" The Plaintiff said

that he'd reported about $344 million, but that he wanted to speak with a detective

about the retaliation campaign against him. The NYPD employee turned to a

colleague and said, "This guy wants to report somebody for stealing $344

million." The Plaintiff explained that he'd already reported the fraud, and asked

if he could schedule an appointment to discuss possible illegal activity involved

with the retaliation campaign. The NYPD employee repeated that the detectives

were busy.

30. The Plaintiff complained that it shouldn't be this difficult for him to report a

crime. He told the NYPD employee that his former employer hired a former

ADA to file an erroneous complaint against him in February. He continued to tell

her that he'd received a phone call from an NYPD detective within thirty-minutes

of receiving a cease-and-desist order from the attorney, and complained that he'd

been trying to speak with an ADA or NYPD detective for three-weeks. The

NYPD employee told him that the NYPD couldn't help him. The Plaintiff said

again that it shouldn't be this difficult for him to report a crime.

31. The Plaintiff continued to tell the NYPD employee that the CEO of his former

firm has an aggressive personality disorder and incomprehensible to manipulate

and deceive others. He continued to explain that he'd learned from Detective

Mistritta that the firm hired a former ADA to write the cease-and-desist order in
February.

32. The Plaintiff commented that Detective Mistritta seemed like a good person
before asking the NYPD employee if she thought it possible that DANY wasn't
taking his claims seriously due to the relationship between Detective Mistritta and
the former ADA. The Plaintiff continued to say that, while he didn't want to,
he'd be forced to file a complaint with the civilian review board if DANY didn't
take his claims seriously.

33. The Plaintiff thanked the NYPD employee for her time, and started to leave the
stationhouse. The Plaintiff literally was halfway through the door when an NYPD
employee called after him and told him to take a seat in a room across from the
front desk.

34. The Plaintiff was told to take a seat near NYPD Officer Jane Doe. The Plaintiff
sat down and introduced himself. The two made small talk for several minutes
before she leaned in and said with a hushed voice, "I'm really sorry about this, but
my boss is here."

35. Confused, the Plaintiff asked, "Sorry for what?" She replied that she and NYPD
Officer John Doe were going to take him to speak with somebody. The Plaintiff
assumed that she meant at another precinct since the desk clerk had told him that
the detectives were busy.

36. An ambulance arrived about 15-minutes later. Confused, the Plaintiff asked
NYPD Officer Jane Doe what was happening. She informed him that they were
taking him to Beth Israel. The Plaintiff assumed they were taking him to speak

with a crime victim's counselor.  He commented that he ambulance was excessive, and said that he could walk the 12-blocks to Beth Israel.  She replied that was procedure, and that he didn't have a choice.  The Plaintiff said "okay", and stepped into the ambulance.  NYPD Officer Jane Doe and NYPD Officer John Doe accompanied the Plaintiff and an EMT to Beth Israel.

37. They arrived at Beth Israel five to ten minutes later.  NYPD Officer Jane Doe, NYPD Officer John Doe, and the EMT accompanied the Plaintiff into the ER.  A hospital employee checked the Plaintiff's vitals.  The EMT went on his way. NYPD Officer Jane Doe and NYPD Officer John Doe escorted the Plaintiff another.  They took an elevator to a basement floor, turned left and walked down the hall before stopping at a security door.  NYPD Officer John Doe picked up a phone receiver.  The doors *buzzed*, and NYPD Officer Jane Doe walked through the two sets of securities doors with the Plaintiff.

38. The Plaintiff's medical records state he arrived at the Comprehensive Psychiatric Emergency Program ("CPEP") at 11:52 am.

**PRN**

39. NYPD Officer Jane Doe spoke with a hospital employee.  The Plaintiff's attention focused on a heavily sedated young man in handcuffs sitting slouched on a bench. He turned and saw NYPD Officer Jane Doe leaving through the security doors. The Plaintiff looked at the young man on the bench.  He turned and asked a hospital employee that was standing about two-feet to his right, "Excuse me sir; where am I?"  The hospital employee ignored him.  The Plaintiff asked two or

three more times, a little louder each time he asked.  The hospital employee didn't acknowledge him.

40. BIMS John Doe's one, two, and three approached.  BIMS John Doe told the Plaintiff that he was going to give him something that would calm him down. That calmed him down.  The Plaintiff said, "That won't be necessary; I'm calm." BIMS John Doe repeated himself.  The Plaintiff said again, "Seriously, I'm calm; that won't be necessary."   BIMS John Doe one said that the Plaintiff would be restrained if he didn't comply.  The Plaintiff said, "I'm calm".

41. The Plaintiff didn't fight them as BIMS John Doe 1, John Doe 2, and John Doe 3 walked him down the hall and into a room with a padded floor.  John Doe 1 and John Doe 2 wrestled him to the floor and restrained him with their body weight. The Plaintiff didn't fight, but pathetically pleaded, "Please don't do this."

### INTERDICIPLINARY ADMISSION FORM

42. Dr. Malaga Aragon, a second-year resident, conducted an initial assessment and filled out the Interdisciplinary Admission Assessment Form at 12:15 pm.

   a.  According to this form, the NYPD brought him to the CPEP for "paranoid delusions that people were out to get him."

   b.  According to this form, the decision to admit the Plaintiff was made BEFORE a CPEP physician examined him.

43. The Plaintiff explained to Dr. Malaga Aragon that he's a whistleblower, and that he'd gone to the NYPD's ninth precinct to report potential criminal conduct stemming from a retaliation campaign against him.  He continued to explain that

he was brought there for threatening to file a complaint against an NYPD detective.

    a. Dr. Malaga Aragon commented, "Patient is angry regarding admission, but calming down with establishment of positive report - persecutory delusions over context of admission".

    b. She *checked* that I was oriented to "person", "place", and "time." She wrote in the "comment section", "Patient is pressured in speech, but story of insider trading not incomprehensible or illogical."

    c. She *checked* "neat" for appearance. (Other Options: unkempt, emancipated, obese, and unremarkable.)

    d. She *checked* "anxious" and "depressed" for effect. (Other Options: flat, constricted, and unremarkable.)

    e. For "mood", quoting me, "Angry, I am a victim and I should not be here."

    f. She *checked* "intact" for memory. (Other Options: impaired, immediate, recent, and remote.)

    g. She *checked*, "pressured" for speech. (Other Options: rapid, halting, and poor eye exam.)

    h. For "thought content (i.e. paranoid, hallucinations, delusions etc.), she wrote, "Needs to be determined if patient is in fact a derivatives trader/strategist to determine level of delusional content."

    i. She *checked* "appropriate" for anxiety level.

    j. For "behavior", she wrote, "Patient is cooperative, pleasant, patient is angry over admission, but in control and good intent of behavior."

k.  Dr. Malaga Aragon summarized at the bottom, "Patient is a 43 year-old

Caucasian male presenting to the ER post being brought in by police after

presenting to precinct to 'report a crime'.  Patient has self-reported ADHD

and PTSD.  In CPEP (psychiatric emergency room), patient presented as

"disorganized, paranoid, rambling, uncooperative, and elevated."  On

admission to 4B, patient is angry, but cooperative and in good discipline

of behavior control.  Needs to be determined in patient is a derivatives

trader at company in question to determine level of thought organization

and paranoia."

### PERSONAL HEALTH INFORMATION

44. Dr. Malaga Aragon completed her Admission Assessment at 12:15 pm.

45. Dr. Malaga Aragon wrote her Protected/Personal Health Information ("PHI") on

the Plaintiff at 12:40 pm.

a.  PHI generally refers to information, medical history, test, examinations,

and other data that a healthcare professional collects to determine

appropriate care for a patient.

46. Dr. Malaga Aragon wrote that the Chief Complaint is "I went to the NYPD to

report a crim."

47. Dr. Malaga Aragon wrote that the Plaintiff was "brought in by the NYPD after he

presented to report a crime."

48. Dr. Malaga Aragon's PHI states that the Plaintiff went to the NYPD to report the

CEO of his former employer, who has a personality disorder, of paying his

psychiatrist to help mentally and emotionally abuse him and prescribe

unwarranted medication to silence and discredit him. She states that the Plaintiff

told her that he "tried for a long time" to report the crime before deciding to try

the NYPD. And she states that the Plaintiff asked her to Google his name so that

she could be certain that the Plaintiff is a whistleblower.

49. Dr. Malaga Aragon wrote that the Plaintiff reported that takes Vyvanse and

Adderall for ADHD.

50. Dr. Malaga Aragon wrote under Review of Systems ("ROS") "No Limits: Patient

appears to be an accurate historian."

    a.  A ROS is a technique used by healthcare professionals for gathering

       medical history from a patient.

51. Dr. Malaga Aragon wrote that the Plaintiff did NOT pose a risk a risk to self or

others.

### DR. ANTHONY LUJACK'S REASSESMENT

52. Attending physician Dr. Anthony Lujack overruled Dr. Malaga Aragon's

determination.

53. Under Differential and Workup, he wrote, "Patient is a 43 year old male with

unclear psych history, presents brought in by police for disorganized, disruptive

behavior, and paranoid ideation; needs admission for safety and stabilization."

54. Under Reassessment, he wrote, "Patient agitated earlier in the day, menacing and

confrontational. Patient given IM (inner muscular) PRNs to maintain safety as

patient refused offer of PO (oral).

55. Under Attending, supervision of resident, he wrote, "I saw this patient and agree

with the residents history and physical except as noted in my assessment.

56. His assessment, "Acute psychosis versus mania, possibly substance induced. Patient requires PRN's for safety.

57. Dr. Lujack stated that he believed the Plaintiff would require more than two-days in the hospital.

58. A hospital employee handed him an oversized brown paper bag for his cloths and a set of hospital scrubs to change into. The Plaintiff changed in the bathroom, was placed in a wheelchair and wheeled to the psychiatric impatient unit of BIMS.

### DR. DAVID KLAHR and MHL 9:39 Form

59. Dr. David Klahr filled out the Emergency Admission (MHL Section 9:39) form at 10:00 pm. He states, "...brought in by NYPD after presenting to police station... patient is acutely psychotic and agitated representing active danger to self and others."

60. Dr. Klahr signed his name in Section C that reads, "I have examined the above-named person and find there is cause to believe that the person has a mental illness for which immediate observation and, care, and treatment in a mental hospital is appropriate and which is likely to result in serious harm to himself or others.

### TREATMEN TEAM

61. On December 3, 2012, the Plaintiff stood in hospital scrubs and *booty socks* before a "team" of residents, social workers, and the attending teacher/supervisor physician Aaron Patterson.

62. The Plaintiff told them that he's a whistleblower, and asked them all to please Google his name so that they could see that he is who/what he claimed to be. He told them that he went to the NYPD's ninth precinct to report possible criminal activity involved with a retaliation campaign against him, and that the NYPD brought him in for saying that he might have to file a complaint against a detective.

63. The Plaintiff was studied and evaluated by three physicians for about five-minutes.

64. First-year post-graduate Dr. Theresa Goldberg's roll is unclear.

    a.  Dr. Goldberg wrote in her H&P (History & Physical) that the Chief Complaint was, "I went to the police to report a crime."

    b.  Dr. Goldberg wrote under History of Illness, "43 y/o caucasian male with no known psych admission brought in by NYPD after presenting to report a crime."

    c.  Dr. Goldberg commented that the Plaintiff asked the "team" to Google his name so that they could see that he's a whistleblower as he claimed. She commented that the Plaintiff informed the "team" that the CEO of his former employer has a personality disorder and paid his psychiatrist to help mentally abuse and discredit as mentally ill and undermine his credibility as a whistleblower.

    d.  Dr. Goldberg stated that the Plaintiff had persecutory delusions and paranoid ideation.

    e.  Dr. Goldberg stated that the Plaintiff was not a risk to self or others.

65. First-year post-graduate Dr. Maria Roccisano was assigned as the Plaintiff's physician.

    a. Dr. Roccisano's chief complaint was that the Plaintiff

66. "During initial interview with treatment team he was found to be grandiose, disorganized, with paranoid ideations, persecutory delusions, and intense. He was superficially cooperative with the initially offered treatment plan however subsequently agreed to take medications."

67. Dr. Roccisano complained that the Plaintiff was refusing treatment in her initial assessment.

68. Attending physician Dr. Aaron Patterson supervised.

    a. Dr. Patterson wrote in his psychiatry admission H&P (History and Physical) that the Chief Complaint was, "I have been trying to report a crime."

    b. Dr. Patterson wrote that the Plaintiff was brought in by the NYPD for paranoid and disorganized behavior.

    c. Dr. Patterson wrote that upon evaluation, the Plaintiff had "significant persecutory delusions", and pressured speech.

    d. Dr. Patterson wrote that the Plaintiff's strengths were his intelligence and physical health.

    e. Dr. Patterson wrote his challenges were "poor insight into illness and need for treatment and substance abuse problems."

    f. Dr. Patterson wrote part of the Plaintiff's treatment plan was to help him gain insight into his illness and need for treatment.

    g.  Dr. Patterson wrote that the Plaintiff was currently refusing treatment.

    h.  Dr. Patterson wrote that the Plaintiff was not a suicide or homicide risk.

    i.  Dr. Patterson wrote the reason for the Plaintiff's admission was that he couldn't care for himself safely in the community due to poor insight into his mental illness.

69. The Plaintiff's case was assigned to first-year resident Dr. Maria Roccisano. Attending physician Dr. Patterson supervised.

    a.  Dr. Roccisano wrote that the Chief Complaint was "I went to the NYPD to report a crime."

    b.  Dr. Roccisano wrote that the Plaintiff was brought in by the NYPD after presenting at the precinct to report a crime.

    c.  Dr. Roccisano wrote that the Plaintiff had "significant persecutory delusions", and pressured speech.

    d.  Dr. Roccisano wrote that the Plaintiff asked the "team" to Google his name so that it could see that he is a whistleblower as he claimed.

    e.  Dr. Roccisano wrote that the Plaintiff was refusing treatment.

    f.  Dr. Roccisano wrote that the Plaintiff was not a suicide or homicide risk.

    g.  Dr. Roccisano wrote that the treatment plan included helping him understand the nature of his illness and need for hospitalization.

## COLLATERAL SOURCES

70. LCSW Kate Thompson contacted the Plaintiff's sister Elizabeth Mitolo. Ms. Mitolo was shocked to hear the Plaintiff had been involuntarily committed to a psychiatric hospital. Ms. Mitolo told Ms. Thomspson that the Plaintiff has no

history of mental illness.  She told Ms. Thomspson that the Plaintiff is a whistleblower.  She told Ms. Thompson that his former employer required him to see a psychiatrist as a condition of his continued employment, and that she had "screwed with his head."  Ms. Mitolo told Ms. Thompson that the Plaintiff had threatened his former employer and the psychiatrist with legal action, and had been trying to law enforcement involved.

71. LCSW Kate Thompson contacted the Plaintiff's mother Pamela Mitolo.  Mrs. Mitolo was shocked that to hear tat the Plaintiff had been involuntarily committed to a psychiatric hospital.  Mrs. Mitolo told Ms. Thompson that the Plaintiff has no history of mental illness.  Mrs. Mitolo told Ms. Thompson that the Plaintiff is a whistleblower.  Mrs. Mitolo said that the Plaintiff had been behaving oddly since his former employer forced a constructive discharge in September 2012.

    a. LCSW Kate Thompson would later confide in the Plaintiff's sister that she was certain that the Plaintiff's story was true.   She explained to the Plaintiff's sister that social workers aren't permitted to offer their opinions to psychiatrist at BIMS.  She didn't specify whether this was policy or custom.

72. Dr. Roccisano contacted Dr. David Brody, the Plaintiff's treating psychiatrist for the three-year period prior to when the Plaintiff's former employer required him to see the CEO's psychiatrist as a condition of employment.  Dr. Brody expressed shock over the Plaintiff's involuntary commitment to a psychiatric hospital.  He confirmed that the Plaintiff has no history of mental illness, and he stated that he never suspected that the Plaintiff had mental illness.

73. Dr. Malaga Aragon, Dr. Goldberg, Dr. Patterson, and Dr. Roccisano all described the Plaintiff's appearance and demeanor to be in direct contrast to what is typical of somebody suffering from psychosis.  They described him as calm, pleasant, and in control of his behavior.  They described his as oriented to person, place, and time, "neat" in appearance and well groomed.

## YOU HAVEN'T LIVED UNTIL YOU'VE PLAYED CHESS IN A PSYCHIATRIC HOSPITAL

74. The Plaintiff refused "treatment" and asked over and over again for somebody to please Google my name to see that I am who/what I claim to be for two-days.

75. Dr. Roccisano told the Plaintiff that his period of hospitalization would be prolonged if he refused treatment.  The Plaintiff shut up and took the medication (Risperdone) she and Dr. Patterson recommended.  The Plaintiff called his mother and told her to do whatever was required to have him released.

76. Dr. Roccisano described the Plaintiff as "superficially cooperative.  Hmmm…) in the Plaintiff's medical records.

77. The Plaintiff complained that the medication made him feel as if he was thinking in slow motion and walking through quick sand.  Dr. Roccisano wrote that the Plaintiff complained of side effects, but didn't show signs of over sedation because he'd been seen walking around the ward

78. Mrs. Mitolo told Dr. Roccisano that the Plaintiff was going to stay with her in South Carolina and pleaded with her to release him.  According to the Plaintiff's mother, they didn't want to let him go.

79. The Plaintiff played chess with a hospital employee at night and when the "team" had gone for the day.  The Plaintiff taught him variations of the Sicilian Defense.  The hospital employee told the Plaintiff that he helped him improve his game significantly.

80. LCSW Kate Thompson confided in the Plaintiff that her husband is a trader on Wall St., and that his story didn't seem that unbelievable.  She wished him luck with pursuing his retaliation claims upon his release.

81. The Plaintiff literally never met with a physician other than Dr. Malaga Aragon (on December 2, 2013) one-on-one for more than a minute before he was released.  Around December 5, 2013, the Plaintiff stopped Dr. Roccisano in the hall and said, "I think you're intentions are good, but let me ask you Dr. Roccisano, 'What do you think would be the worst possible thing that could happen to somebody who'd been victimized?'"  Answering for her, the Plaintiff replied, "To be blamed, punished, or not believed by law enforcement or medical professionals."  He asked if she'd *Googled* his name as he asked.  Dr. Roccisano tilted her head like she was studying him.  The Plaintiff said, "Thanks Doc. That'll be all."

82. The Plaintiff was released on December 9, 2013.  As a condition of his release, the Plaintiff had to agree to follow up care, including continuing to take 6 mg of Risprodone, and describe his "illness" in his own words, and sign a document declaring he has a mental illness.

### THE DISTRICT ATTORNEY OF NEW YORK

83. The Plaintiff sent about a half-dozen emails to senior management of his former employer, cc'ing the former ADA they hired to filed a complaint in February 2013, asking that they please have Detective Mistritta arrest him so that he could gain an audience with an ADA after he was released.

84. Detective Mistritta called the Plaintiff a few days later. The Plaintiff explained that the NYPD had him committed to a psychiatric hospital. Detective Mistritta said, "You're kidding." The Plaintiff replied, "That's not something you joke about Bob." Detective Mistritta said that he'd call him back.

85. A Lieutenant from the NYPD's ninth precinct called the Plaintiff a few days later. The Plaintiff doesn't recall the Lieutenant's name, but it's a Ukrainian name. The Plaintiff believes he's a community affairs officer.

86. Detective Mistritta arranged for the Plaintiff to meet with an ADA in February 2013. The Plaintiff met with ADA Cannata and his supervisor. The Plaintiff was shocked when ADA Cannata read him his Miranda Rights. ADA Cannata told him that he wasn't being arrested, and asked the Plaintiff about the conduct he'd tried for weeks to report.

87. The Plaintiff informed ADA Cannata that it's common knowledge that the CEO of his former employer has a personality disorder. He explained that the CEO claims that he's codependent, but that codependency isn't a personality disorder. "Dependency", on the other hand, is a trait associated with narcissism. The Plaintiff continued to explain that the CEO has a history of "Gaslighting" targeted employees, and that he sends these targeted employees to see his psychiatrist, whom he pays to help mentally abuse them. The Plaintiff told ADA Cannata that

the CEO paid Dr. Henricks to help mentally abuse him and defame him as

mentally ill to undermine his credibility as a whistleblower. The Plaintiff told

ADA Cannata that an employee from his former employer who'd previously been

targeted told him that the firm had paid her "several hundred thousand dollars" in

July 2012, and asked him what DANY has to do to check her bank statements.

88. According to ADA Cannata, he determined that the Plaintiff is mentally ill and

not a credible witness after speaking with the CEO, hearing that the NYPD had

him involuntarily committed, and speaking with the Plaintiff. ADA Cannata

claims that he didn't want to tell the Plaintiff that he'd determined that he wasn't a

credible witness because he was fearful of how the Plaintiff would respond. The

Plaintiff learned in December 2015 after he filed a complaint against ADA

Cannata and briefly named ADA Cannata as a defendant in his civil suit he is

litigating pro se in the S.D.N.Y against his former employer.

89. The Plaintiff also learned that Dr. Henricks, the CEO, and two other senior

employees from his former employer lied to ADA Cannata.

90. ADA Cannata claims to have properly investigated his criminal allegations

against Dr. Henricks, his former employer, and the CEO. The Plaintiff can't be

certain because DANY won't speak with him about the investigation, but he

asked dozens of times.

91. ADA Roque is on the ECF system for the Plaintiff's civil suit against his former

employer. The Plaintiff has submitted into evidence documents that prove the

CEO of his former employer lied to ADA Cannata. The Plaintiff has additional

documents that he can provide DANY proving that the other defendants in his

civil suit lied to ADA Cannata.  The Plaintiff has asked several times to file a

complaint against them for lying to an ADA who was conducting a criminal

investigation.

92. On June 7, 2012, the Plaintiff emailed Ms. Roque and asked one last time for

DANY to discuss the criminal complaint that he filed in February 2014.  He wrote

that he's not qualified to determine what is and is not actionable, but that like

some closure as a victim.  If it's not actionable, it's not actionable.  As a victim,

the Plaintiff explained, knowing would help him obtain closure.  The Plaintiff also

asked one last time to file a complaint against those he'd previously accused for

lying to ADA Cannata.

93. The Plaintiff explained to Ms. Roque that he will be extraordinarily upset to

discover that DANY deliberately impeded his tireless efforts to obtain justice to

cover up for the NYPD's egregious deprivation of his civil rights.

94. It would've been a lot easier for the Plaintiff to secure counsel for his claims

against his former employer had DANY communicated with him.  The statute of

limitations has expired for malpractice claims against the CEO's psychiatrist.

DANY is in possession of evidence that the Plaintiff could've used.  DANY is in

possession of evidence that can be used in a breach of fiduciary duty claim.  The

Plaintiff is litigating his claims against his former employer pro se because he

couldn't find an attorney to take such a weird case on contingency.  The

Plaintiff's case against his former employer would've been resolved years ago if

DANY hadn't withheld information from him.  The Plaintiff has filed this

complaint pro se today in order to avoid losing his malpractice claims against
BIMS.

95. The Plaintiff can't litigate two cases pro se at the same time.  There's not much to
litigate about this case; his medical records prove everything.

96. Something isn't right at DANY.  According to ADA Cannata, he and DANY
believe the Plaintiff is mentally ill.   The mentally ill are awarded the same
protections under the US Constitution as the mentally healthy, and the Plaintiff
plans to file a motion for the appointment of pro bono counsel.

<u>**CLAIMS**</u>

USC 42 1983

DEPUTY INSPECTOR JOHN CAPPELMAN, NYPD OFFICER JANE DOE,

and NYPD OFFICER JOHN DOE

VIOLATED THE PLAINTIFF'S

FOURTH AMENDMENT RIGHTS


97. The MHL authorizes the NYPD can take any person take into custody and have
him transported to a CPEP  "who appears to be mentally ill and is conducting
himself in a manner which is likely to result in serious harm to himself or others."

98. The Plaintiff's medical record state, "Patient presented himself to Ninth Precinct
to report a crime; brought in by NYPD for 'paranoid delusions that people are out
to get him'."  Deputy Inspector John Cappelman ordered NYPD Officer Jane Doe
and NYPD Officer John Doe to detain the Plaintiff and have him transported to

BIMS CPEP without having reasonable cause to believe he had a mental illness for which is likely to result in serious harm to self or others.

## CITY OF NEW YORK LIABILITY

99. Deputy Inspector Cappelman sets customs and policies within his precinct and for the officers under his command.   Further, the clear from repeated instances of similar wrongful conduct documented below, the use of unconstitutional acts to retaliate and/or intimidate those who have or might report police misconduct, fellow officers and civilians alike, is endemic within the New York City Police Department.   The widespread de facto custom of taking people into custody without probable cause, making false statements, and using coercion in order to further deprive an individual of his constitutional rights to cover up or retaliate against this person is tolerated, often encouraged, by senior policy makers within the department and the City of New York.

100. Most notably, Adrian Schoolcraft v. City of New York et al. 10-CV-6005 (RWS) (S.D.N.Y).  Mr. Schoolcraft, an eight-year veteran of the New York City Police Department, has alleged his commanding officer, Deputy Chief Michael Marino, ordered him taken into custody and transported to a CPEP in retaliation for having exposed misconduct within his precinct.

101. Other relevant cases include:

102. Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v. Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint and is convicted of falsifying police records);

103. Taylor-Mickens v. City of New York, 09-CV-7923 (RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint review Board against the precinct);

104. Lin v. City of New York, 10-CV-1936 (PGG) (S.D.N.Y) (officers arrest a person lawfully photographing an arrest of a bicyclist in Times Square and swear out criminal complaints that are contradicted by video evidence);

105. Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order dated November 29, 2009 denying the City's motion to dismiss on Iqbal/Twombley grounds, wherein the police officers at issued were and prosecuted for falsifying evidence, the Honorable Jack B. Weinstein wrote: "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration— through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department— there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged."

106. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests

officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

107. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

108. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

109. McMillan v. City of New York, 04-cv-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an AfricanAmerican man in Kings County and initiated drug charges against him, despite an absence of an quantum of suspicion);

110. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

111. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

112. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y.)(police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

113. Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP) (S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

114. Richardson v. City of New York, 02-CV-3651 (JG)(CLP) (E.D.N.Y.)(officers fabricated evidence including knowingly false sworn complaints, against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

115. Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged the NYPD had an "unwritten but persuasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

116. White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

117. Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis 20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of policy to regulate against police officers who exposed police misconduct and a failure to train in the police department).

SECOND CLAIMS:

USC 42 1983:

FOURTH AND FOURTEENTH AMENDMENTS

MOUNT SINAI HEALTH SYSTEMS, DR. ANTHONY LUJACK,

DR.MALAGA ARAGON, DR. DAVID KLAHR, DR. AARON PATTERSON,

DR. GOLDBERG, DR. ROCCISANO, BIMS JOHN DOE 1, BIMS JOHN DOE

2, and BIMS JOHN DOE 3

*118.* The Defendants violated the Plaintiff's Fourth and Fourteenth Amendment rights
by involuntarily committing him without reasonable cause that he had a mental
illness for which immediate inpatient treatment and care in a psychiatric hospital
was appropriate which was likely to result in substantial physical harm to self or
others.

*119.* The Defendants acted under the color of state law.   The Plaintiff's medical
records state that he was admitted before a CPEP physician examined him.  The
Plaintiff's medical records state that the Chief Complaint, or reason for
admission, was that the NYPD brought him in for presenting to the ninth precinct
to report a crime.  The NYPD reported the Plaintiff had persecutory delusions and
paranoid ideation.  The Plaintiff was admitted for persecutory delusions and
paranoid ideation.

120. Dr. Malaga Aragon examined the Plaintiff and determined that he was an
accurate historian, and most importantly not a threat to self or others.
Subsequently, there was no justification to involuntarily commit the Plaintiff.

121. The Plaintiff does not recall meeting Dr. Anthony Lujack.  If they spoke, it
wasn't more than one minute.  He overruled Dr. Malaga Aragon's assessment,
stating that the Plaintiff was brought in by the NYPD for disruptive and paranoid

behavior.  He agreed that the Plaintiff was not a threat to self or others, but that

Plaintiff had psychosis and required PRN's for agitation.

122. The Plaintiff doesn't recall speaking with Dr. David Klahr.  He too agreed that

the Plaintiff was not a threat to self or others, but should be admitted for

psychosis, persecutory delusions, and paranoid ideation.  He states that the

Plaintiff required PRNs for agitation.

123. The OMH states that agitation is not a reason that justifies an emergency

situation that warrants treatment over objection.

124. Dr. Lujack ordered the BIMS John Doe 1, John Doe 2, and John Doe 3 to

physically restrain and forcibly medicate the Plaintiff without justification and

against his will in violation of his Fourteenth Amendment right to bodily

integrity.

125. Clinical Agitation is described as uncontrollable behavior, such as excessive

motor or verbal activity, that can escalate to aggression resulting in harm to the

patient or others without intervention.   Components of clinical agitation include

excessive movements and restlessness (pacing, clenching of fists, pulling of hair

or clothing), impulsive and pressured nonsensical speech, angry speech, and

verbal threats and yelling.   The Plaintiff's medical records state that he was angry

over being admitted, but calm, pleasant, in control, oriented to person, place, and

time etc. etc.  All of the Defendants agreed with the initial assessment.  There was

absolutely no justifiable reason to restrain and forcibly medicated the Plaintiff.

126. The Rivers v. Katz decision (67 NY2d 485 (1986)) requires a written court order

or an imminent emergency situation to medicate an individual over his/her

objection. The administration of medications in emergency situations requires the input of a physician. Medication treatment over objection in emergency circumstances can be construed as a "drug used as a restraint." These records are missing from the Plaintiff's file. The Plaintiff has asked for them four-times. A supervisor told the Plaintiff that the records were destroyed in a fire.

127. Nothing in the Plaintiff's medical records indicate agitation.

128. The American Association for Emergency Psychiatry ("AAEP") developed project BETA (Best Practices in Evaluation and Treatment of Agitation) as a guideline for generally accepted medical standard for treating agitation in a CPEP. BETA calls for; (1) Medical evaluation, (2) Psychiatric evaluation, (3) Verbal de-escalation, (4) Psychopharmacologic (oral sedative), (5) Physical or manual restraint and forced medication. Verbal de-escalation involves a series of communication loops where the clinician listens to the patient, finds a way to respond in an agreeable way or validates the patient's position, and then calmly states what he wants the patient to do. The average intervention, according to Project BETA's two-year study, takes five-minutes, and could involve a dozen or more attempts before a patient complies.

129. The Defendants didn't come close to adhering to the acceptable standard of care.

130. Restraining and forcibly medicating somebody is only appropriate when verbal de-escalation fails, he's believed to be mentally ill, and is behaving in a manner which presents a serious risk to him, others, and property.

131. Individuals have the right to refuse treatment in hospital settings and are presumed competent to do so, unless proven otherwise.  The Defendants had no reason to presume the Plaintiff was incompetent.

132. The Defendants substantially deviated from the reasonable and acceptable standard care.  The Plaintiff has suffered humiliation and substantial economic harm.

## CLAIMS FOR RELEAF

The Plaintiff request relief to be determined at trial.

Respectfully submitted,

Steven A. Williams